The first argument will be docket number 25-1045, Ollnova Technologies v. ecobee Technologies. Mr. Sandinato, I believe you're going to present argument first, right? That's correct, Your Honor. Okay. Are you presenting on just the cross-appeal issues or will you be commenting on the appeal issues? Just the cross-appeal. Just the cross-appeal. Okay. If the court has an uncontrollable urge to ask you about the appeal issues, you know, that might happen. Okay. Please begin whenever you're ready. Mike Sandinato for the cross-appellant ecobee. I believe I got that right. May it please the court. We have a number of issues on appeal, and so unless the court has a preference, I thought I'd start with subject matter eligibility because that goes across all patents, and that would result, if decided in our favor, in a reversal without the need for a remand. Then I'll move to infringement or non-infringement of the 371 patent. That's an appeal of a JML. That would result in reversal for that patent. After that, I'll move to the verdict form and jury instruction issues, which, if there's anything left of the case, will require a remand. We quite frankly believe that those issues have already been decided by the federal circuit in the Optus v. Apple case. Let me ask you a housekeeping question. Given that there's also the parallel appeal, I'm going to say the one that comes after this, the IPR-related appeal, what claims, if any, survive that we would need to deal with in this appeal if we were to affirm in that IPR appeal? There are some claims that, if the IPR were affirmed, would survive and would still be at issue. I apologize. I don't have the numbers of the claims off the top of my head. It's at least claim 20, but is it also claims 11 and 12? It looks like someone there might know the answer. You're correct, Your Honor. It's claims 11, 12, and 20 would survive, would be part of this case, unless, of course, this court reverses on the 887 patent on the subject matter eligibility issue. So does that mean one other housekeeping question, if you don't mind, related to 101? The 887 patent, I think you all agreed that claim one was representative of the 101 dispute. Correct. It turns out, just if we assume that in the second case we were to affirm the board, we really only have claims 11, 12, and 20 in front of us. Would we still analyze claim one for 101 purposes? I believe so. That's the claim that has been briefed. That's the claim that the parties have agreed has been representative. So I don't think anything changes there. Okay. Thank you. Okay. So if I may, then, I'll dig into subject matter eligibility. On eligibility, these patents are about nothing more than using well-known networks to control components or communicating using well-known means between components. They're about things like receiving, storing, transferring information. The common flaws in all of them are that there's no concrete implementations. None of the components are new. None of the networks are new. None of the methodologies are new. That intro concerns me a little bit because, you know, we've always cautioned that the analysis on subject matter eligibility for a claim can't abstract the claim at too high a level of generality. There's always going to be some generalization of what is really the gist of the claim. But just saying that all of the claims across all of these patents is just merely receiving and communicating information using well-known components, I don't think gives enough credit to each of the asserted claims here across each of the three patents. So I think you need to go a little more deeper into examining why the features that are asserted by the patent owner and being some kind of technical-based means for accomplishing a particular result isn't good enough. Absolutely, Your Honor. I'll dive right into the specifics. We're already running out of time. I'll do my best to dive right into the specific claims. So, for example, let's start with the 495 patent. That's the patent where the court already has found that there's an abstract idea of controlling generic components using information from two separate sources, information from two networks. That's the abstract idea in that case. I would submit that in the case of the other two patents, the 371 and the 887, we have similar kinds of abstract ideas. In the case of the 887, it's a similar abstract idea of communicating a change-of-value message, a generic kind of message, and repeating that message. That's the abstract idea. In the case of the 887 patent, just sticking with the 371, that final limitation with regards to repeating a message multiple times or until knowledge or a message is received, the specification talks about how there can be, often can be, times of communication failure in a wireless network system. Because you're just going to lose data transmissions quite often. And so we need to know when the failures happen, or we need to know and get confirmation that the transmission actually got received. So you solve, according to the patent specification, that communications failure problem with sending the message repeatedly or until you get an acknowledgment message. Why can't that be regarded as a means of solving a technical problem that alters the way the communication system otherwise would work by sending the message on repeat until you get an acknowledgment back from the receiving device? Well, I would start by saying, Your Honor, that that is an abstract idea, communicating. We're simply repeating a message. Well, let's slow down there before we just reach the conclusion that simply repeating a message is an abstract idea. What I'm trying to look at it is from the perspective of the wireless communication system itself, right? Ordinarily, it's not repeating these messages. But now the system is designed and these devices are designed to keep sending out the message until it gets an acknowledgment back. Why isn't that arguably altering the flow of data through the wireless network? Because it's not bringing a technical solution to that problem. It's not saying anything about how it's done. It's a result-oriented approach. It's claiming the technique of repeating the message by a result-oriented functionality, not saying anything about how it's done. There needs to be more how there. And in the case of the 371… Part of your argument is there's a lack of specificity in the claim that aids your argument in terms of an abstract idea. Is that what you're saying? That is certainly part of our argument, that there is a lack of specificity, primarily as to the how. There's nothing specific about how it's done. And there's nothing specific about what a change of value message… Is that what, in your view, makes it not a technical solution, simply the lack of specificity? I'm not sure those two concepts are exactly congruent with one another. I would say that a main thing that makes it a non-technical solution is the lack of a description of how something is done. It's that the claim runs right to a result-oriented functionality. Okay. Have we said previously that in assessing whether your assertion that this is a non-technical solution versus your counterpart's suggestion that it is a technical solution, that the amount of description or specificity or how-ness, for lack of a better word, is relevant? Yeah, I would say that that's discussed in the GoTV case, GoTV v. Netflix, that specifically focuses on the absence of the how, on this idea that if ordinary components are used to carry out an abstract idea by their ordinary functions and they're just as tools, but there's no description of the how, that results in ineligibility. It results in ineligibility. I would refer the court to the recent decision, GoTV v. Netflix. Let's move to the 495. I suppose if we were to agree with you that there was something wrong about the jury instruction on essentially what was step two for that claim, then it would have to go back for a reevaluation of that issue with a better and corrector instruction, right? That would certainly be one path that the court could take, but that's not the primary path we're urging. We believe that at trial, the plaintiff failed to present sufficient evidence of inventive concept. The evidence that they presented was, in our view, identical to the abstract idea. We made a JMO motion, which the district court denied, and so we are appealing that JMO motion. Our first ask, if you will, would be to reverse on Alice step two and find the 495. The other side will get up and say there is some daylight between what is in the claim and what was expressed as the abstract idea and that what is in the claim is this two-mode operation where you just use the first network alone all by itself, and then mode two, you're using the first network somehow in combination with the second network and therefore relying on two information sources. And again, the articulated abstract idea didn't quite get into that level of detail. It just said using two networks. There are some differences in the words of the abstract idea and what the plaintiff is saying. So therefore, I don't know if we could necessarily, as a matter of law, say, well, the abstract idea just maps cleanly on to the recited features in the claim. So what I would say is the abstract idea is controlling using two networks, and what Onova told the jury the inventive step is is using one network sometimes and using both networks at other times. But there's no description. I'm going to come to the how again. There's no description of when or how that is done. And so that level of abstraction cannot confer eligibility. Do you agree that if we vacate and remand and propose a new jury instruction that identifies the abstract idea, would that cure your concerns in terms of step two being tried to the jury for the 495? It cures the jury instruction and verdict form concerns, Your Honor, but in our view, that does not address the fundamental issue that Onova failed to provide sufficient evidence of inventive concept at the trial when they had the chance. And so we think that this court can look at the trial record, can look at the similarity, in our view, the identity between these two things, controlling generic components, using information from two separate sources, which is the abstract idea, and then what they said was the inventive concept, using one network sometimes and using two networks at other times. Now, the reason the district court sent it before the jury is because there were purported factual disputes on step two for 495, is that right? That's correct. Were any factual disputes raised with respect to the other two patents? And also, before you sit down, I do want to get to the third of the patents. So with the other two patents, in terms of subject matter eligibility, the court found no abstract idea. Right, so it's just at step one. But I'm asking at any point in time, did the other party raise factual disputes with respect to those other two patents? They did raise some in the motion to dismiss briefing. I don't recall exactly what they were, but they did raise some. Let's say, hypothetically, we have to vacate and remand for step two for the 495. Would that decision alone mean that this court would not necessarily need to address all of your appeal arguments related to damages, and therefore also not need to address the prejudgment interest question in the appeal? We don't believe so, Your Honor. If there is a remand, then... We would have to vacate the damages report. You would have to vacate the damages report. But then we have these, what we believe, a live Daubert appellate challenges, but very meritorious ones. And so we do think that this court would need to address the Daubert motions on the market approach that the damages expert used, and the Daubert motion on the marking issue, the conclusive testimony. Just to clarify, would we need to? Because we've already vacated the damages award, and so all of those underlying rulings are likewise gone, too. Correct, but then we would find ourselves in the district court for a new trial on the surviving patents, where presumably the district court would stand by the Daubert rulings, which we believe are erroneous. So you want us to, right? So maybe it's a verb or semantics issue. You want us to address those, because it's going to potentially go back for a new trial, but not a necessity to address those. I think it's what Judge Chin is asking about. Yeah, that's a fair characterization. I would say that certainly in the interest of efficiency, it makes sense to address them now. They're here now. They're briefed now. They're before this court. If we go back to trial under those same Daubert ground rules, and there's a damages award. But you did put prejudgment interest in a different category, right? It sounds like you just are saying potentially the Daubert stuff, we don't necessarily have to address prejudgment interest because of the damages vacated. That I agree with.  My adversary may say something different, but I do agree with that. Is it possible that on a retrial, all of the experts could offer a more fully developed story as with relation to any of these issues? The marking question of the apogee system or the damages question and the comparable license debate? Well, they'd be confined by their report. So for apogee, for example, the only thing that their technical experts said in their report about apogee is that I've seen no evidence of the presence of these. It's absolutely conclusive retestimony. The reason that's all that he's- I do want to ask you about that, but I would think the district court has discretion to reopen expert discovery if asked and if he chose to do that. And coming back to your statement about efficiency, because I'm really struggling with which issues we should decide here if you prevail on something. There could be a retrial. It could be with a different verdict sheet on infringement. Perhaps the jury doesn't find infringement and then there is never a damages issue in front of us. So arguably that's more efficient for us at least. That result certainly would be our hope, Your Honor. But again, because we think that the district court was wrong on these deliberate decisions, we think that this court should address them now so that we go back. If we do go back to trial, we go back with fairer ground rules. We haven't touched on 887. I feel like we should probably at least talk through that some. Do you contend that 371 and 887 rise and fall together? And assuming you do not contend that, what is the purported abstract idea that the representative claim for 887 is directed towards? We don't contend that they necessarily rise or fall together. We think the issues are similar. The analysis is similar. But it's a different patent and a different abstract idea. The abstract idea in the 887 is selective transmission of data based on a predetermined threshold. That's the abstract idea. The predetermined threshold is not specified. The claim doesn't give any details as to when you would selectively transmit other than to say it's based on this threshold. Going back to the patent specification and what it describes here and what it appears to claim is what the inventor was directing its solution at, I'd like to hear your response to the patent owner's view that what's going on with this claim is a solution to a prior technical problem related to indiscriminate, continuous monitoring of sensors and then continuous indiscriminate transmission of those sense conditions across a wireless network. What they've decided to do is an elegant solution to only transmit the most important, valuable information and also to do the polling of the sensors in very fixed, discrete time periods to, again, reduce the amount of monitoring that's going on. What we've got ultimately in this claim is a device that is reducing the load on the network. It's reducing power consumption. It's reducing signal interference across this wireless network. And so, ta-da, we've got a technical means to a technical problem. So, Joe Chen, I would say that all those things are goals, but they're not in the claim. And the claim doesn't describe anything about what the threshold is. The claim doesn't describe anything about when the polling should take place, when the transmission should take place. So, I would come back to the lack of detail. What do you think is your best case for why the 887 is directed to nothing more than an abstract idea and lacks in the best case? I would say electric power in terms of the facts of the claims and analogizing our claims to the claims that the court dealt with then. I would say the electric power case. If we reach the issue of an instruction to the jury with respect to step two, is there any reason that we couldn't say that something to the effect of you are to assume that the abstract idea is the following? Is it important, and it seems like you were suggesting it was in your briefing at times, but I don't know if I'm misunderstanding. Is it important for the jury to know the court has actually made a decision and this is what the abstract idea is, or is it sufficient to tell the jury in analyzing step two, as properly instructed, you are to assume that the claims are directed to the following abstract idea? We think it's important that the jury knows that there is an abstract idea. Gotcha, but can it be by, do they need to know that the court decided it and does the court have to have decided it or could it simply assume it for purposes of 101 and just tell the jury essentially apply this abstract idea? I think that the word assume would be confusing to the jury. I think the jury would be confused as to why we're making assumptions as opposed to what really happened. What really happened is just much like claim construction, much like when the court can excuse a claim and the jury is told what the claim construction is. Here the court made a legal determination about this claim, i.e. that it contains an abstract idea. The jury should be told that and should be told what the abstract idea is so that it can do its proper analysis under the BSG case, which then says needs to ask what else is in the claim beyond the abstract idea. Do you have your proposed jury instruction somewhere in your brief? I don't think that we mapped it out exactly as such, but it would involve, the risk of repeating myself, it would involve an explanation of the Alice Step 2. By the way, we did submit detailed jury instructions to the district court. I thought it was included in the brief. It's not in the brief, but I think it would be in an appendix. But it would involve an explanation. Just to clarify, are you standing by the one that you presented to the district court in terms of what should be instructed on Step 2? Because my recollection is in the actual joint appendix I saw at least a description of the instruction proposed. Yeah, we are standing by what we proposed at the district court level. Can I ask a question on marking? I think I interrupted you on marking. Are there two issues you're raising? One is the admissibility of Dr. Mattesoli's testimony, and then second is the sufficiency of Alnova's showing that there was nothing that had to be marked? It really is two issues, yes. One, the admissibility, it's conclusively testimony, so we don't believe it should have ever been admitted. And with or without that testimony, there's no evidence that Alnova did not carry its burden of proving that the Siemens Apogee product did not practice the patent. I recognize one could characterize his testimony. I think it's around page 771 here as conclusory. But he says, and it appears that he was showing some demonstratives to the jury at the time. He says, I looked at everything I could find relevant to Apogee. I compared it to limitations of the claims. He apparently highlights certain of the disputed claim limitations. And he says, I'm just not aware of any Apogee system ever practicing any of these claims. Why is that not adequate if we reach the issues to sustain that part of the verdict? Because he never even went the step of saying, the Apogee system did not practice these elements. He said, I'm not aware of any evidence that Apogee practices. Is that the only distinction? What if we translated his testimony as saying, I've looked at this Apogee system up and down and I cannot find limitation X for this claim nor limitation Y for that claim. Somebody's proven me wrong because I can't find it. But it's their burden. It's their burden. I understand that. But what if that was the testimony? It needs to have limitation X. I looked. I can't find it. Can somebody find it? Because I can't find it. It's not there. How do you prove a negative, I guess, is the real problem. Well, you start by gaining an understanding of how the product really works, which he never did. So that would be the starting point. That's how an infringement analysis is done, for example. You learn how the product works. And then you say, the expert says, it doesn't do this limitation. Here's what it does. It explains what it does. Do you have an expert that says, oh, yes, there is limitation X in the Apogee system. It's right over here. We did not. We did not. And that comes to Articat and who has the burden. And again, here we're dealing with a very special situation, quite frankly, where this Apogee system is identified in the patent as an embodiment. So the starting point is pretty unique. And quite frankly, we believe very strongly in our favor. And we think that we- What level of detail do you contend would be necessary to be sufficient for Dr. Massey's marking analysis? Again, it would need to involve an understanding and an explanation of how the product actually works vis-a-vis the limitation that he's analyzing. One more on the- I think I found your instruction at 2104. And you may want to take a look at it because I have a very specific question. But you'll see there's a paragraph near the bottom, I guess, line 16. At line 6, it says, on this issue, ECOB tenders the following instruction on patent eligibility. That's why I infer that it is your proposal. At 16, you talk about step one, requires determining whether claims are directed to an ineligible category. And then my question is, you would then have the judge say, I have already determined that the asserted claims of the 495 patent are directed to an abstract idea. Would it be, in your view, somehow inadequate to say something more to the effect of, here I direct you or here I instruct you that the claims are directed to an abstract idea and then go on and say what the abstract idea is, as opposed to telling the jury, hey, I sat down, I'm the judge, I thought about this, and I'm the one who determined this. I do like direct you better than assume, Your Honor. But the fact that the judge did the cognitive hard work to decide what the abstract idea is, you don't think the jury has to know that. I would prefer if it did, but as a backup, I think that to say directed would be better than assume. The word assume in your earlier question did trouble me. We have to move on. So we'll give you a little bit of time for rebuttal. Thank you, Your Honor. I appreciate that. All right, let's hear from Mr. Walker. Mr. Walker, just for housekeeping purposes, if, hypothetically, in the second appeal here, this Court affirms the Board's decision there with respect to those claims in the 887, we don't know if it will continue to press the remaining claims in this litigation? Yeah, so we don't think that, we don't think you should affirm the IPR, but even if you did, we don't think that affects the judgment in the District Court appeal, and that's because, as was noted, not all the asserted claims were challenged in the IPR. Claims 11, 12, 20 were asserted in the District Court, as well as Claim 1. Only Claim 1 was ruled unpatentable in the IPR. There's no collateral estoppel effect with respect to any other claims. You would continue to assert those three claims in the District Court case if we were to affirm on the IPR or patent appeal. You're not going to just say, I don't even need that patent. I'm just going to move forward with these other two. I mean, certainly it's something we can consider at this point. We're not saying, no, we're going to drop them. And more fundamentally, insofar as the infringement verdict rests on the 887 patent, those dependent claims are sufficient to sustain it because the additional limitations that they have were completely undisputed. If you look at Appendix 2061, you'll note where we, in doing our 50A, we note that they did not... We don't know exactly which patent and which claim the verdict is resting on based on the way it was drafted. That is true. But when there is no doubt... So insofar as it rests on the 887, the mere invalidation of Claim 1 of that patent is not going to affect the verdict because the dependent claims have all the same claims. So if the jury found Claim 1 was infringed, they also found the dependent claims were infringed because the additional limitations were completely undisputed. And because this is kind of the spillover effect of the other appeal, this isn't in the JA, but Trial Transcript 709-11, Dr. Mattacetti testifies about the dependent claims' additional limitations. There's no cross on that. And then Trial Transcript 773, Ecobee's expert has nothing to say about any additional limitations of the dependent claims. So those are absolutely disputed. There's no way the jury could have found Claim 1 infringed but not the dependent claims. The problem is we have no idea if the jury found Claim 1 infringed because the verdict sheet doesn't tell us. That's true. But even assuming that it did, the jury also would have found the dependent claims were. Assuming that it didn't, there's no problem with that. Do you have an argument in defense of the verdict form in light of OCTIS? I think OCTIS tells us what the verdict form should do now. But the district court held, I think correctly, that the unanimity objection, which is the basis for OCTIS, but it's a unanimity problem, was waived by Ecobee because they did not timely raise it at the... I'm sorry. I don't want to beat a dead horse, right? But if this goes back to trial, it's going to be that I would assume both sides are going to be supportive of a verdict form that separates out the patent and claim so that we can actually know which claims potentially are found infringed or invalid, et cetera, et cetera. Yes? Sure. If it needed to go back down, we think it doesn't need to go back down. But for purposes of this appeal, we don't think the district court abused its discretion in denying a new trial. So if, hypothetically, we put waiver to the side, either because we don't think there was waiver or we think there's exceptional circumstances that permits us to reach an issue that was otherwise waived, is there any other reason to defend this verdict form? I admit it's difficult. I think what the district court pointed to is the fact that when it came to damages, which is what we all really care about, it instructed them only to award damages only as to asserted claims that you, the jury collectively, have found to be infringed and not ineligible and not invalid. And that's Appendix 73. I think the district court understood that that was getting sufficiently at the idea that the jury all had to agree on claims for infringement, immunity, and responsibility. I, candidly, a very similar direction was in the verdict form in Optus, but it was not addressed in the court's opinion. I think that is the basis. But I do recognize that the district court's waiver, which I don't think that ECOB has been able to overcome, is the primary submission. Any objection to the verdict form and jury instructions or jury instructions or a verdict form at least presenting the abstract idea? Now moving on to Section 101 eligibility. Yeah. So with respect to that, I think fundamentally the district court didn't abuse its discretion in declining to give that more expansive instruction that ECOB requested because given the nature of the party's presentations and the nature of the factual inquiry it was asked to decide. Because consistent with the abstract idea decision, the district court said it's directed to this abstract idea. We tailored our presentation so no one argued that the abstract idea provided the inventive concept. Our only testimony... We send it back, hypothetically. If we send it back, would you object to an abstract idea being put in jury instructions or a verdict form or both in terms of identifying it? I think Optus tells us at this point that informing the jury of that is at least the preferred course going forward. We might have some little quibbles around the edges, but I think fundamentally Optus tells us now that it's probably a best practice for the district court to inform the jury of that. But it doesn't mean it's reversible error in this case on this record for the district court not to have done it because the only thing the jury could have done in finding that this was not conventional is agreeing with Dr. Mattacetti that the two modes of communication or two modes of operation, one free of communications with the second network provided the inventive concept. It was the only thing that Dr. Mattacetti identified. I'm a little confused by that. Dr. Mattacetti, I think, repeatedly testified. This is about the 495 patent. That was the only 101 issue in front of the jury, right? It was with respect to the 495? Correct. He testified that, in his opinion, it was a technical solution to a technological problem. And at least our case law, I think, says that's a step one analysis, meaning by definition that the claims, if they are a technological solution to a technical problem, are not directed to an abstract idea. So it seems to me he was fighting, and your whole presentation was fighting the court's finding at step one, which would seem to make this a prejudicial error situation. Well, no, because I think what he identified as being the technological solution was the unconventional aspect of having this mode of operations that's free of communications. So appendix 1692, actually 1686 and kind of going through 1692, free of communications is the one thing he says over and over and over again is what makes this inventive, novel, unconventional. And that is when he says that this is not conventional, and that is the step two inquiry. That is what he's pointing to, the jury in finding. What is it about that first network operating free of communications from the second network? Why is that inventive when it was already standard operating procedure to use a single network free of any communications from any secondary, tertiary network? Well, I think the key is that you have the two modes of operation. So it's connected to that second network, and it can work in connection with it, which is what the prior art that Ego Bee was pointing to did. But it also has the second mode that's free of communications. And as Dr. Mattacetti explained, that wasn't in the prior art, which is not identical to the nonconventional inquiry, but it's very close to it. If it's not something that was happening in the prior art, a jury could properly find that is not conventional. And I'll note here that Ego Bee's expert, Ego Bee bore the burden of proof by declaring he was missing evidence on this, never addressing his one-on-one analysis, the free of communications inventive step that Dr. Mattacetti was relying on. He mentioned it in connection only with 102 and 103. His one-on-one was separate. He never mentioned it there, and a jury could find, but that wasn't enough for them to carry their burden on this actual question. I'm stuck on the jury instruction, I guess, but whether it's prejudicial error that the jury wasn't told what the abstract idea is and that they need to find something significantly more than the abstract idea in order to rule for you, ultimately, on step two, it seems like even under your characterization of what Dr. Mattacetti was saying about the inventive concept at least seems to track or overlap what the district court found with the abstract idea. So, again, how could the jury have separated it out and done a proper step two analysis without being told these things? Yeah, so what the district court found was the abstract idea, and what no one is disputing here was the abstract idea, is the two networks. Dr. Mattacetti admitted, yes, there were two networks in the prior art, so he could not possibly have been arguing that that was something more, that that was the inventive step. What he identified as the unconventional inventive novel step was the free-from-communications mode of operation in addition to operating in response to data from the second network. It was the only thing he identified as being nonconventional there. And so if a jury agreed with us on that point as it did, it could only have been because it agreed with Dr. Mattacetti that that was unconventional. Even Ecobee's expert recognized that Mattacetti agreed the prior art disclosed the first and second networks. That's Appendix 1583. So both experts agreed, yes, first and second networks were out there. They may well have been conventional. They're certainly in the prior art. The point of debate, the only thing the jury could have been relying on and agreeing with us on that was that the two modes of operation, one free-from-communications was unconventional. And actually on that point, Ecobee's expert didn't offer any opinion that it was conventional. What if we have to do something that disturbs the 101 conclusion on the 495887 or 371? And for example, we feel compelled to send the 495101 issue back. What is that? To what extent does the court need to address all the other issues? I understand there's a jamal denial on the 371 infringement question. But aside from that, what about all the other issues that touch on marking, damages, rejectment of interest? So those eligibility issues would only warrant disturbing the infringement finding or the damages award if one of the patents was ultimately found to be ineligible. And I think if you just need a retrial on Step 2 of the 4095, that doesn't necessarily mean the jury will find it ineligible, in which case the prior liability finding could stand. And same deal, again, we don't think you should, but if you found that we had to go to Step 2 on trial for the 371 or the 887, again, if a jury agrees with us that those are eligible and that Echobee hasn't carried us. My point is, wouldn't there need to be a new trial? Doesn't there need to be a new trial both on infringement and damages? And it's not just a retrial potentially on 495 Step 2. We don't know which claim or claims the jury found to have been infringed in the first trial. So I would think infringement would need to go back. Likewise, damages would need to go back because damages could easily be altered based on which claim was found to be infringed here versus whatever unknown claim the jury in the first trial found to be infringed. So I think infringement and damages only get disturbed if it turns out that one of those patents is ineligible and could not support the infringement and damages verdict. So you could tell the district court, go resolve the eligibility issues. I'm sorry. If we think under Optus the verdict form for infringement is clearly wrong, then why wouldn't there need to be a new infringement trial just on that alone? So if the verdict form you found constituted a reversible error, there would have to be a new infringement trial. And why wouldn't there likewise need to be a follow-on new damages trial? And in that event, I think a damages trial would follow to a jury case. A jury could come to a different conclusion. That's the playing field. Now the court has to decide there's a multitude of issues in this appeal. Which ones really need to be decided? So I think on damages, prejudgment interests probably don't need to resolve because if the jury awards a reasonable royalty, that issue more or less goes away because then the damages are payable if they accrue, rather than the lump sum situation. I think the court and its discretion could certainly say it would be best to have answers to these questions so the parties know how to conduct any retrial that has to occur. But the court could also say... Taking a look now at what Bergman and Mattis said in the first trial, because it's fair to assume that they will testify again in any second trial. Yeah. If the court wanted to remand on that because it thought that there had to be a new trial on these other more fundamental issues, I think we'd be okay with that. Do you have a preference if there's going to be a new trial that we reach those issues about your witnesses or do you have a preference that we don't? I don't think we have a strong preference. I do think that it actually might be helpful on the markings. We think that Ecobee did not even carry its initial burden to identify specific products because that requires and that may alone simplify any issues that have to be resolved on remand. Okay, so we're running out of time. Can we hear your best case on why the 371 and 495 survive the 101 challenge? Yeah. And how relatively thin these claims are in terms of what they have to tell us. I think Unilock versus LG is pretty helpful on this. So it was a pretty simple simian claim broadcasting a series of inquiry methods and adding to each inquiry method an additional data field for polling. It seems pretty simple, but the court said that's directed to a technological way. It changes how this system operates and it creates benefits that are identified in the specification. And that is enough at step one to not be directed to an abstract idea. The district court correctly found that that's what happened here. These are changing the function of these building automation systems in a way that generates benefits that are identified in the specifications themselves. For the 371, you relied in part, maybe even primarily, on the nature of the change of value update, which I guess is a combination of a bunch of change of value messages. And I didn't see any claim construction that gives some specialized meaning to change of value update. I'm just thinking from the perspective of the device and the overall system, it's just data. So you're just receiving data and then you're going to communicate the data. So I don't quite see at the moment or appreciate why there's something about this change of value data that is something that should be regarded as a technological solution to a technological problem. I think it's because it's changing the way that it transmits the data. That was the same sort of thing that happened in Unilock. It added a data field. A data field is not another kind of data, but it's being added here. And in the patent... You're just saying it. I don't understand right now. Just assume for the moment I see the phrase change of value update and I feel nothing. It means nothing to me. Tell me why I should get excited by that phrase. So the key is what it's doing is that it is gathering and pushing together this change of value information from multiple devices. That was the key way in which it changed how it operated. So if it's just taking a bunch of already existing messages and then combining them into one basket, why should I get excited about that? Well, that's changing the way that it operates. It's changing the way that it transmits data and it creates exactly the benefits, the technological benefits, solving technological problems in these building automation systems. There's something in the patent specification that says we have a game changer here. We've taken these messages and we've combined them into a single basket and now...  Yeah, so... We just had a major technical breakthrough here. They may be a little bit more modest about how groundbreaking it was, but it was still... Where in the patent spec do I get...  So storytelling about the nature of the change of value update. Appendix 189, column 7, toward the bottom. I think it's 58 through 65. 189? Yeah, it's page 189 of the appendix. And this says that by allowing these change of value messages to be gathered and pushed from one or more automation components, 200D, to one of them, to 200A device, and then the 200A device is what pushes that to other system components, as opposed to pulling each of those individual automation components, the 200B components. By doing that, by gathering up and then sending them along, you use less wireless bandwidth and you... I'm sorry, which column in line? Column 7. I think it's at line 58. If column 7 is at A189, what line of column 7? It says 58. Yeah, 58 to 65, yeah. So it talks about how gathering together and pushing them up, gathering from all these different devices to one of the devices, and that device is what passes along, actually creates these technological benefits. It wasn't reinventing the wheel, but it is something that is fixing a specific problem about eating up bandwidth and consuming more power than was necessary and having delays in how these things were sent. This is your best extrinsic support for why you believe the representative claim for 371 is not directed to an abstract... Yeah, and I think that's consistent with the analysis in Unilock, which is you are changing how it functions, how it transmits, even if it's how it transmits data, and you are solving these technological problems with a technological solution. And I'll note in the prosecution, this is Appendix 7697, the examiner noted that the prior art only did one of these change messages. It didn't draw a bunch together from multiple devices. What is your best intrinsic support for why you contend 887 is not directed to an abstract idea? So the 887, so this is the polling at intervals and selectively transmitting or suspending. This was a technological improvement. Again, changed how it functioned over the old way of doing it was continuous monitoring and broadcasting. This is Appendix 143, column one, I think lines 34 to 43, 49 really, describe how this is. So you had the old wireless networks have this continuous monitoring and broadcasting. Eight up bandwidth, it was noisy, it strained the power, it strained the process. It's a claim by itself. It just says an automation device comprising a transceiver that's going to transmit data if the data meets some threshold or exceeds some threshold. And you're not gonna send data if it doesn't exceed the threshold. And so it's just comparing the data against some baseline. Invention. Well, I think we have to look at everything together. So it certainly has those aspects of it being the selective, the dynamic value reporting, but also the fact that it's polling at intervals. And so it's not doing the continuous monitoring and broadcasting. You have an interval both for the polling and for the transmitting. And both of those things are using up less bandwidth, they're using up less power. Those are technological benefits that are in the patent itself. I think Unilog versus LG is really on point in saying even if the claims don't say and you will save power and you'll save bandwidth, if what the claims are reciting enable those benefits, that that's enough to be a technological solution and survive step one as the district court found. Can I take it back to 371 just for a moment? That's the one where there's a J-MAL, an appeal from the denial of the J-MAL of non-infringement. The argument as I understand it is Dr. Mattesetti only said about infringement essentially that he believed that Ecobee's witness, Mr. Hytala, I think, testified to how the accused product sent a certain message twice. But is that really your evidence? And is that sufficient evidence from what your reasonable jury? It is. And Dr. Mattesetti has a way of speaking that's a little bit elliptical. I'm not aware if something means I didn't see it in there, for example, in the marking. Here, I didn't hear him say it. It actually means I heard his testimony and Mr. Hytala explained how it actually is repeated. And I'll walk through this. So Hytala was testifying at Appendix 1237. So the first of two kinds of messages that are discussed, productive order, I've got to be careful with the one that begins with a vowel. It includes a set of COB information that corresponds to the claimed COB update that is sent on a regular schedule. Usually an acknowledgment is sent in response. Dr. Mattesetti testified to that at Appendix 2005 and 2006. Okay. Am I missing something? You said Appendix Page 1237? 1273. I'm sorry. I may have transported the digits. I apologize.  And this is... Wait, let me get on the right page. Mine doesn't have 1237, so that was going to be problem one. Okay. And then 1277 may be the most helpful because this is where Mr. Hytala is testifying. And what he is acknowledging there, a little bit unwillingly, but he's acknowledging that if the acknowledgment isn't received, then the next message that's sent according to that schedule, that regular interval, includes the same previously sent set of COB information. That is the same COB update within the terms of the claim. Where did you say that? Along with a more recent set of COB information. Where are you? Yeah. So this is at 1277.   There's some things marked with confidence. Yeah. And I'll be very careful about them, but I think it's at the bottom of 77 to 78. So line 22 of 1277. It says the next message would be very similar, and he goes on and explains. So maybe I'll just describe in somewhat more generic terms. So on these regular intervals, the first one is sent at the specified time. It includes the COB update that is, say, it's the A information. At the next scheduled interval, usually you just have B. But if you didn't get that acknowledgement for A, what it sends is A and B. And so that A is repeated, and that A corresponds to the COB update. There's no requirement that the precise transmission be identical, as long as, under their view, the same COB update is sent, and it is. So it's particular lines of information are sent, and then those same lines of information are sent again if the acknowledgement isn't received, along with some additional information. And that's really what's happening. That's why they say the later message is different. Additional information? It's the one that you would normally send at that next interval for the most recent period. It's kind of like two COB updates? COB update one, which was the original message, and then COB update two, which would be whatever interesting new thing happened in the interim? That's a fair way of characterizing it. And because COB update one is sent the first time, and then it's repeated if you don't have that acknowledgement, that would be sending the same COB update, even under their construction. Now, we think, because they didn't ask to have that construed, that it's an extremely deferential view, and that a and the imply more than one. So I think the district court, for that reason, additionally found that the jury could find infringement. But even under their view, that you have to send the same COB update, that same set of information is sent both times. There's just some additional information, but adding something is not getting you outside of the patent, as long as you're checking the boxes on the limitations. I really don't want to, but I have another question. And it's about Mr. Bergman's testimony about comparable licenses. And I did not see, or if you could explain to me why he could credibly assert that three of the patents of the 120 patent portfolio were more valuable than the remaining 117, just because those three patents had been asserted in a patent infringement action against the party. So he said he may well have been able to reach that conclusion, but in terms of his analysis, he did not take that as a given. He did not assign them extra weight. Well, he was trying to find a way to reach a conclusion where he could say, it's very safe and conservative for me to assume that the patents asserted in this case have at least equal value on a patent-by-patent basis to every other patent in the patent portfolio that was taken to the carrier. And I'm trying to understand the logic behind that. Yeah. And I think what he's saying is that the focus of that negotiation was particularly those patents because they've been asserted, but more broadly, the only thing that the negotiations talked about was just to do with our smart thermostats, this building automation technology that the patents asserted there and the patents asserted here are all concerned with. That's Appendix 650. I'm now still trying to get to that patent-to-patent conclusion that each patent should be an equal value to all the other patents of the portfolio. Pretend that right now, I don't get it. Yeah. So, I think what he was saying that all of these patents deal with this building automation, smart thermostat technology. All 120? Yeah, that's all NOVA's patent portfolio is about this building automation technology. So, they have that similarity to it. And I think that's similar to Bio-Rad where the patents all were in the same area of technology and that consistent with the estimation and the uncertainty that's inherent in damages analysis, there's never gonna be a perfectly comparable license that it was fair to... Sure, you have to do some accounting though for the differences between the patents that are asserted in litigation and then this big block portfolio. They certainly did. And he reduced it proportionately to say, well, there was a large number of patents there. I'm gonna reduce it proportionally to reflect only the four patents that are being asserted here. What was his best support for doing so? Like the best factual support, best legal support for doing it where each one is getting equal weight. What's his best support for that? So, I think it's probably that three of the same assertive patents were there. They're kind of the center of negotiations. And more generally, the negotiations were all about these smart thermostat technologies, which also these assertive patents are about that kind of technology. And so, it was fair, consistent with the estimation that's inherent in this for him to say there are at least an average amount of value with all the other patents that are working there. So, you're saying that three or four patents were the center of the negotiations? Well, so, they were listed in the license itself. That's Appendix 8414. And our... It was to settle the litigation. It was... Those were the patents that were assertive. Those were the assertive patents, yes. And then, looking just a little bit more broadly, Mr. Padian, a well-known staff witness who was part of the negotiations, explained that the negotiations with that prior licensee just had to do with smart thermostats. That's Appendix 650. And so, we know the smart thermostat technology, which is both the old assertive patents and the currently assertive patents, was what they were caring about. The settlement agreement, it actually rejects the notion that it represents a hypothetical negotiation. Isn't that right? I think that may be common language in there. And, you know, we're not saying... Don't take this as being a representation of a hypothetical negotiation. Yeah. And that may be, you know, further reason for the prudence in not trying to give the three specifically named patents outsized weight in there. But I don't think it takes away from the fact that negotiations were about smart thermostat technology. The assertive patents are about smart thermostat, building automation technology, and that, as a result, it's fair to assume, you know, making the changes you have to make in this comparable license analysis and the estimation that's involved with it, to say that they're probably worth at least an average amount of the value of that prior license. What appendix page did you give us? I don't think I found the page. You gave us an appendix page slide. I just want to make sure I have it. So I think probably 650 was the one. That's where our witness explains the prior negotiations. And what was the agreement site? The agreement is at 8414. That's in the second volume.  One quick question. We might as well go in on this, right? On pre-judgment interest, I want to ask you, because it's just intriguing. What is your argument that patentees should get pre-judgment interest that goes back beyond the six-year period? Yeah, so the limitation into... The courts of America have spoken, haven't they? They all went against you. Well, I think the statute supports us, and I think the court's precedents support us. Specifically what you think in the statute supports us. Well, I think the statute says that we need to be compensated for infringement. The General Motors v. DVEX case says that pre-judgment interest is part of that compensation to make sure that we're in as good a position as we would have been if the infringer had entered into a reasonable royalty agreement. We know that needs to be compensated as of the hypothetical negotiation from cases like Laser Dynamics and Wing Labs. And 286 is no bar to that. It says you can't recover for infringement that happened more than six years before the complaint was filed. This is all compensation for infringement that happened within the six years, starting in 2016 and going onward. Here, we have the court, though, because the infringement actually started earlier. The hypothetical negotiation, as everyone agreed, would have occurred in 2012. So you want interest based on the hypothetical notion that you should have been paid in 2012, right? Yes, and I think that's... So I'm struggling to line that up with the language of 286, which says no recovery, not just no damages, no recovery, which I was thinking was no interest. No recovery shall be had for any infringement committed more than, in this case, before 2016. But you're asking for interest that would only be due between 2012 and 2016. But what is the interest for? It's for infringement that happened after 2016. And it's because district court told the jury the lump sum is paid all up front, fully paid up lump sum at the time of hypothetical negotiation. Ecobee's expert described lump sum. They wanted lump sum. We actually didn't. The lump sum means the licensor gets the money all up front at a negotiation that would occur in April of 2012. So over what precise period do you contend you should receive or your client should receive pre-judgment interest? Give me the exact years that you're thinking. From the hypothetical negotiation in April 2012, which everyone agreed was the hypothetical negotiation date. And their expert used that date in talking about a lump sum that we would get the money all up front, Siemens, I guess, prior to the patent at the time. So that's Appendix 1885 through 1890. Their own expert is explaining that that's paid all up front. It would only be for infringement that happened in 2016. So I don't know that you've still answered the entire period question. I know what date you want it to start. When do you want it to end? I think it would run to the judgment, pre-judgment interest. It would end upon the judgment and then we switch over to post-judgment interest. But in all honesty, pre-judgment interest is not our fundamental thing. We're more interested in defending the judgment than we actually got. But I certainly do want to answer the court's questions on that issue as well. Okay, thank you very much. Thank you. Do you want rebuttal? We'd be fine without rebuttal. We'll see. Okay, I don't even... Ten minutes. Ten minutes? More than I thought. Thank you, Your Honor. We'll see. Mr. Walker, we kept Mr. Walker for a very long time. Thank you, Your Honor. I'm going to start with a waiver. We obviously completely disagree that anything was waived with respect to the unanimity argument. You didn't say unanimity, did you? We did not use the word unanimity, but we objected on the grounds of jury confusion, with exact language, confusing the jury and incomplete in view of the instructions and evidence regarding patent-by-patent analysis. So we certainly think that notwithstanding the not using the word unanimity, that the concept of unanimity is subsumed by that objection. We also... I also want to point out that unanimity is not our only argument against the verdict form. We also argued on this appeal and it has not been disputed by Lenovo that the single-question verdict form deprived us of adjudication of our non-infringement counterclaims. So that's a separate, independent reason why the verdict form should be reversed. In Optus, the plaintiff also argued waiver and the Optus court found that there was not waiver because the district court addressed the unanimity argument in his post-trial briefing and that happened here as well. So that's yet another reason that we think strongly cuts against waiver. And lastly, and I think this goes to the questions that Judge Cunningham asked, in a lot of ways, the waiver argument is moot because there will be reversal. We believe there should be reversal under Optus based on the single-question verdict form and once we're back at trial, the court needs to follow Optus and I think I heard Lenovo agree that if we get back at trial, there needs to be a multiple-question verdict form. So that's what I'll say on waiver. If there are no more questions, I'll move on. Okay, the 495. We heard from the other side that the jury could not have possibly considered what counts as the abstract idea in its step two analysis given Mr. Mattesetti's very, very specific testimony as to what was unconventional, this notion of using a first network free of communication, that that was the key to everything. So it was exactly the opposite. I mean, they very much leaned into the abstract idea. As a matter of fact, the essence of our Jambo motion is that what Mattesetti, what Dr. Mattesetti pointed to as the inventive concept was indeed the abstract idea and we think we should win on the Jambo. Do you have the sites? The sites? Yeah. Yeah, so his supposed inventive concept was appendix 1971, which is 1075, 1723 of the transcript. This is where he identified the supposed inventive concept as one where both networks work together and one where the first wireless network is operable to control free of communication with the second wireless network. The other side is saying that's not quite the same thing as the abstract idea. It might be a cousin of it, but it's some more specific version of the articulated abstract idea in the way that there's now daylight there and the jury, if it really keys in on that first network free of communications from the second network, then that's the, whatever you want to call it, some kind of point of novelty. And that's a great way of looking at this issue, Your Honor. We do have a disagreement on that and we think that we win and we think that's why the Jamal on the 495 section 101 should be reversed, but at a bare minimum, these close, very, very close cousins, we would say identical twins, in order to parse that out, the jury needed to understand what the abstract idea was. So we think we should win on Jamal, but I could call it as a backup, absolute minimum, this expert strongly leaned into the abstract idea at trial. If no more questions, I'll move on to 371. Your time. Thank you, Your Honor, I appreciate that. On the 371 patent, we talked a little bit or you talked a little bit with Honolulu's counsel about Mr. Hytel's testimony. He was very, very clear. This is that appendix, page 1278. He was very clear that... 1278. 1278, excuse me, Your Honor, that in the case that he was describing, these were very, very different messages. His literal language was it's a very different message. These confidential markings, what are the chances that some of these can be unmarked? I think that some of it can. And we tried to be judicious about where we mark, but this doesn't relate to our source code. But if the court would like, we can go through an exercise where we try to reduce our redactions. At least for this area, I think that would be helpful. Okay, well, we'll do that. But again, I would direct this court to that part of the testimony where he said that they were very, very different messages. But I don't want to reveal anything I shouldn't, but Dr. Mattis said he had, let's say, a spin on that. The relationship between the two messages suggested to him and his expert analysis that they were in some ways materially similar, sufficient enough. You know what I'm referring to. What makes that, I don't know, such an outlandish opinion that a reasonable jury could not have accepted it? Well, I would point to what Dr. Mattis said he said on cross-examination about his opinions. He said on cross-examination that sending a first message once and a different message later is repeating. That, in our view... But that's not the only thing he said. I guess he also testified that if the second message has content that is same or similar to the content of the first message, then effectively the first message is getting resent. So I don't think it was the same or similar. I think what he said is if the second message encompasses, and I don't think he said it this clearly, quite frankly, but I think for purposes of this dialogue... We learned that. I learned it very much at trial, Your Honor. Excuse me. For purposes of this conversation, I think we can say that what he said was that if a later message encompasses some of the same information as an earlier message that is repeating, and we just fundamentally disagree that a reasonable jury could find infringement under those circumstances, based on that evidence. That we have a claim that says sending a change-of-value message, repeating the message that needs to be the same message, sending a different message that may include some of the same data, is not repeating. Why was that not a claim construction question that if you thought the claims were that narrow, as you've just suggested, you had an obligation to raise that at some point? I understand the question, Your Honor. We don't think we have an obligation to raise it as claim construction. We think that we were in a situation where a plaintiff presented evidence that was so at odds with an ordinary and understandable meaning of the word repeating that we chose to go to the jury and get a non-infringement verdict. We expected a non-infringement verdict. Quite frankly, we may have gotten a non-infringement verdict on this patent for all we know. It wouldn't surprise me because the evidence was just not there that we repeated. And so we do not think that we were under an obligation to get a claim construction when we are the proponent of the ordinary meaning of the term repeating. If you confirm the denial of Jamal on the 371, there would still be a trial, a second trial on infringement for the 371. Correct. Okay. There would need to be. I'm assuming also the one on the eligibility that the 371 gets past the eligibility issue as well. That's correct. And then lastly, I'll go to damages. There was a lot of discussion with my opposing counsel on the patent counting, the lack of apportionment based on the 100 plus patents. I also don't want to lose sight of the other aspect of our damages appeal and that's this Jungle Scout report. And, you know, in so many ways, and all of us said that Mr. Bergman did Acobee a favor by assuming equal value of these three patents. It could have been more. His next step was to multiply that number by 1,000 based on a single report that reported the supposed relative sales of Acobee and this other licensee on a single sales channel, Amazon. This is a classic situation where the evidence that he relied on for that conclusion, for that multiplier, 1,000, was simply did not support that conclusion. Is there a case that you have that would back you up that this is an unreasonable proxy? I think Ecofactor. I mean, it's a different... Your Honor knows Ecofactor well, obviously. It's a different set of facts. But in Ecofactor, the court reversed because the evidence did not support the conclusion that the expert drew and that it was materially prejudicial to the defendant. And so I would say Ecofactor for that proposition. And again, this mistake was particularly acute in view of the different nature of Ecobee and this other licensee. Ecobee sells smart thermostats. These smart thermostats are consumer products that are sold on Amazon. This other company, I believe the court knows the name of the other company. The other company is a very, very large company. It's an industrial company that sells HVAC equipment and other equipment like that. They sell through very, very different channels. And yet, Mr. Bergman thought that it was appropriate to multiply it by a thousand times based on this single report, which he admitted was flawed. And he admitted, and this is in the record, he admitted that he had no basis for assuming that the relative sales of these two companies on other channels, on non-Amazon channels, were different. So we feel very strongly that there is. I have a final question. So if we all agree that if there were to be damages here under a hypothetical negotiation, that lump sum of the damages needed to be paid out in 2012 because that would have been the date of the hypothetical negotiation. Is that correct? I don't view that that lump sum would have needed to be paid out. And the hypothetical- Isn't that the law, though, that in this legal construct of our hypothetical negotiation, the date of it would be 2012. That's the date of the negotiation. And also, that would be the date of when the parties would resolve the payment issue as well in terms of the defendant being able to practice the patented technology. I think the hypothetical negotiation rubric exists to determine what amount the parties would have reached, but I don't believe that it says this is when it would be paid. And I would go back to the Section 282 statute that says that no recovery, as Your Honor pointed out, of any type can be obtained for anything that is six years before the filing date of the complaint. Section 286. 286. So I do not think that the hypothetical negotiation goes to when it would have been paid. I think that simply goes to assessing what the amount would have been, at least the timing aspect of it. And you're viewing interest, prejudgment interest, as being recovery. Correct. That's part of it. Although, if I'm not going to be held to my agreement on that number of questions, just quickly, the title of the 286, I think, only references damages. Doesn't it say time limit on damages? But the language is no recovery. So there's just, what, an inconsistency between the title? Well, I would say the titles are there for convenience, much like in contracts, titles are there for convenience, not necessarily to trump what's said in the language of the statute itself. Did you review and analyze the pertinent legislative history for Section 286? I did not, no. Okay. That's an easy question. Thank you. Thank you very much, Mr. Zendinano. Mr. Walker, do you have anything to add? I would be happy to answer any questions that the court has, but otherwise I'm fine to go without rebuttal on that. Did you review and analyze legislative history for Section 286? No, I haven't. Okay, then. Thank you very much. The case was well argued. The court appreciates both sides' attorneys. Thank you. Case is committed.